**SEALED**

FILED
U.S. DISTRICT COURT

2017 JUN -5 ⊃ 4: 20

DISTRICT OF UTAH

BY:_____
DEPUTY CLERK

Jonathan O. Hafen (6096) (jhafen@parrbrown.com)
Jenifer L. Tomchak (10127) (jtomchak@parrbrown.com)
Cynthia D. Love (14703) (clove@parrbrown.com)
PARR BROWN GEE & LOVELESS
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840
Fax: (801) 532-7750

*Attorneys for Relator and Plaintiff Travis Cella*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES ex rel. TRAVIS CELLA,<br><br>Plaintiff,<br><br>v.<br><br>MOBICHORD, INC., a Delaware corporation; HERBERT UHL, an individual; and ALEXEY KLIMENKO, an individual,<br><br>Defendants. | **COMPLAINT AND JURY DEMAND**<br><br>Case: 2:17-cv-00527<br>Assigned To : Campbell, Tena<br>Assign. Date : 6/5/2017<br>Description: SEALED V SEALED<br><br>**(FILED UNDER SEAL)** |

Relator and Plaintiff Travis Cella ("Relator" or "Cella"), through his undersigned counsel, hereby alleges, avers, and complains of Defendants MobiChord, Inc. ("MobiChord") and Herbert Uhl ("Uhl") (collectively, "Defendants") as follows:

### INTRODUCTION

1. The United States of America, by and through *qui tam* relator Travis Cella, brings this action to recover damages, penalties, and all other remedies available under the False Claims Act, 31 U.S.C. § 3729 *et seq* ("FCA").

2.     In addition, Cella—acting in his individual capacity—brings claims for retaliation, breach of contract, wrongful termination, and other wrongs, as described below.

3.     Relator's allegations pertain to Defendants' failure to disclose MobiChord's foreign ownership as required by law and Defendants' misuse of classified information.

4.     Knowing that MobiChord was ineligible to enter into government contracts under which it would acquire and handle classified information, on information and belief, Defendants nevertheless entered into a contract with the United States Department of State (the "State Department") that would necessarily require MobiChord to handle such information.

5.     Compliance with the National Industrial Security Program ("NISP") is a prerequisite for any contractor seeking to work with classified information.

6.     Defendants expressly certified that MobiChord met all of the requirements for handling of such highly sensitive information or, in the alternative, impliedly certified the same because compliance with the applicable rules and regulations was a prerequisite to the government's payment.

7.     Consistent with his ethical and legal obligations, Cella informed MobiChord's management that MobiChord was violating federal law by failing to disclose required and material information to MobiChord's government clients.

8.     Rather than comply with its clear legal obligations, MobiChord, by and through the individual defendants, terminated Cella's employment in retaliation for reporting MobiChord's violations.

## JURISDICTION AND VENUE

9.     This action arises under federal law in that it seeks relief for violations of the FCA, 28 U.S.C. § 3729 *et seq.*

10.    Consequently, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 3730.

11.    Personal jurisdiction over Defendants is proper in this Court because Defendants reside and do business within the District of Utah.

12.    Venue in this Court is proper because Defendants transact business in this District and the facts forming the basis of this Complaint occurred within this District.

13.    The facts and circumstances of Defendants' violations of the FCA have not been publicly disclosed in a criminal, civil, or administrative hearing, nor in any congressional, administrative, or General Accounting Office or Auditor General's report, hearing, audit, or investigation, or in the news media.

14.    Relator is the original source of the information upon which this Complaint is based, as defined in the FCA, and he has disclosed the information upon which this Complaint is based to the United States.

## GENERAL ALLEGATIONS

### Parties

15.    Relator is the former VP of Sales for America for MobiChord.

16.    MobiChord is a telecom service management company that employs a data aggregation tool to provide enterprise-level analysis and optimization of its clients' mobile device usage so that the client can better manage its mobile device expenses.

17.    For example, MobiChord collects detailed information about phone calls, text messaging, email usage, GPS and location-based data, and web browsing of each individual user within an organization and applies its data analysis tool to determine the most optimized mobile device plan for each user.

18.    By identifying the optimal plan for individual users within organizations that have thousands of employees that have vastly different mobile data needs, MobiChord's clients are able to save thousands of dollars per month in unnecessary expenses and overage charges.

19.    MobiChord offers these subscription-based services to federal, state, and local governments, as well as private businesses.

20.    All of MobiChord's officers and directors are non-U.S. citizens.

21.    MobiChord was founded by Uhl and Alexey Klimenko ("Klimenko").

22.    Uhl is a German national, MobiChord's current CEO, and member of MobiChord's board of directors.

23.    Klimenko is a Russian national, MobiChord's current CTO, and member of MobiChord's board of directors.

24.    Raphael Holdermann ("Holdermann") is a German national, MobiChord's current COO, and a member of MobiChord's board of directors.

25.    Amir Klaus ("Klaus") is a German national and MobiChord's VP of Sales for the United Kingdom.

26.    Toby Storey ("Storey) is a British national and MobiChord's Senior VP of Field Operations.

27.    Christian Hartmann ("Hartmann") is a German national and MobiChord's VP of Sales.

**Cella's Employment with MobiChord**

28.    For the past 18 years, Cella has worked for a variety of companies involved in government procurement contracts.

4

29.    During that time, Cella developed extensive expertise in the government procurement process.

30.    Recognizing the value of that expertise, Uhl personally recruited Cella to work for MobiChord.

31.    Uhl promised Cella that if he left his current position, he would receive an ownership interest in MobiChord, be paid an ongoing commission for the sales contracts he procured, and have a great degree of independence in how he operated the sales team and procured sales contracts for MobiChord.

32.    Cella relied on these promises when he decided to leave his prior employment, which paid a substantially larger base salary, to accept a position as MobiChord's Vice President of Sales America on January 16, 2016.

33.    Uhl then directed Cella to focus on expanding the company's footprint with federal and state governments, as well as with private companies.

34.    Cella's employment contract with MobiChord guaranteed a base salary, plus commissions earned on subscription invoices in America. A copy of Cella's employment contract is attached hereto as Exhibit A.

35.    Under the contract, Cella earned a commission of seven percent (7%) of the annual subscription payment of any new customer invoice he generated and three percent (3%) of the annual subscription payment on any invoice generated by his sales team or from any existing customer, up to the first $2,000,000 in invoices.

36.    For all invoices after the $2,000,000 threshold, Cella received an additional commission of two percent (2%).

37.     Additionally, Cella participated in MobiChord's stock option program (the "Option Program").

38.     The Option Program awarded Cella one percent (1%) of MobiChord's shares, vesting over four years.

39.     Twenty-five percent (25%) of Cella's option was to vest on the first anniversary of his employment with MobiChord, February 1, 2017.

40.     Thereafter, the remaining seventy-five percent (75%) of his option was to vest 1/48 per month.

41.     Thus, on February 1, 2017, the first quarter of Cella's option was to vest.

42.     On information and belief, Cella's option was valued at more than $750,000.

43.     Cella was very successful during his time at MobiChord, bringing in the most contracts for large clients in the whole company.

44.     In or about October 2016, Cella received a performance bonus, which Uhl expressly stated was in recognition of Cella's exemplary work.

**Requirements for Government Contractors Working with Classified Information**

45.     For the contracts that MobiChord was negotiating with the federal government, MobiChord was required to comply with the National Industrial Security Program ("NISP"), a program established in 1993 to safeguard classified information that is released to contractors, licensees, and grantees of the federal government.

46.     Among other things, NISP requires all government contractors who deal with classified information of any type to do the following:[1]

---

[1] *See* DoD 5220.22-M, *National Industrial Security Program Operating Manual* ("NISPOM"), attached hereto as Exhibit B; 32 C.F.R. pt. 117.

a. Companies eligible for access to classified information or award of a classified contract must obtain a facility clearance. NISPOM 2-100.

b. Such companies must appoint a U.S. citizen employee to supervise and direct the procedures protecting classified information. NISPOM 1-201 through 1-202.

c. Government contractors must conduct periodic reviews of their security arrangements and certify on an annual basis that such reviews have been conducted, the results of such reviews, and any corrective action taken. NISPOM 1-207.

d. Only U.S. citizens are eligible for security clearances. NISPOM 2-209.

e. Contractors are required to ensure that non-U.S. citizens are not employed in duties that require access to classified information. NISPOM 2-209.

f. Contractors are obligated to ensure that only authorized persons have access to classified material. NISPOM 5-500.

g. Contractors are obligated to establish control systems under which the reproduction of classified material is held to the minimum consistent with contractual and operational requirements. NISPOM 5-600.

h. Contractors handling classified information through a computer information system must adopt security protocols to protect classified information and certify that such protocols have been adopted. NISPOM 8-100 through 8-103.

i. Contractor employees located outside of the United States may have access to classified information pursuant to a valid contract, but under no

circumstances may a non-U.S. citizen employee located outside the United States be granted access to classified information. NISPOM 10-601(a)-(b).

    j.   Storage of classified information by contractor employees at any location outside the United States is strictly prohibited, unless the non-U.S. location is controlled by the U.S. government. NISPOM 10-602(a).

    k.  Classified information may only be transmitted outside the United States if the recipient is a cleared contractor employee and if such transmission occurs through U.S. government channels. NISPOM 10-603.

    l.   In order to qualify for a facility clearance, the company must not be under foreign ownership, control or influence ("FOCI"). NISPOM 2-102(d); 32 C.F.R. § 117.56.

    m.  A U.S. company is considered to be under FOCI "whenever a foreign interest has the power, direct or indirect, whether or not exercised, and whether or not exercisable through ownership of the U.S. company's securities, by contractual arrangements or other means, to direct or decide matters affecting the management or operations of that company in a manner which may result in unauthorized access to classified information or may adversely affect the performance of classified contracts." NISPOM 2-300(a); *see also* 32 C.F.R. § 117.56(b)(1).

    n.  A U.S. company under FOCI "***is ineligible*** for [a facility clearance] unless and until security measures have been put in place to mitigate FOCI." 32 C.F.R. § 117.56(b)(2)(i) (emphasis added).

47.     Companies are also required to complete a Certificate Pertaining to Foreign Interests when applying for a facility clearance. NISPOM 2-302. A copy of the Certificate Pertaining to Foreign Interests ("Certificate") is attached hereto as Exhibit C.

48.     Among other information, companies completing a Certificate are required to disclose whether any foreign persons, directly or indirectly, have a beneficial ownership interest of five percent of the company or more. Ex. C.

49.     Companies are also required to disclose whether any non-U.S. citizen serves as a member of the board of directors or as a senior management official of the company or in any other way is able to influence or control the operations of the company. Ex. C.

50.     Completion of the Certificate is a requirement for a facility clearance. Ex. C.

51.     It is a federal offense punishable by a maximum of five years' imprisonment, a $15,000 fine, or both to make a false statement—including material omissions—on a Certificate. Ex. C.; *see also* 18 U.S.C. § 798 (establishing criminal liability for disclosure of classified information).

52.     Companies under FOCI may still qualify for a facility clearance, but only if they adopt methods to negate or mitigate the foreign ownership or control. NISPOM 2-303.

53.     However, under all such mitigation plans, individuals in management positions with access to classified information must be U.S. citizens residing in the United States. NISPOM 2-304.

54.     Contractors that seek to negate or mitigate FOCI must annually certify their compliance with such mitigation procedures. NISPOM 2-308(b).

**MobiChord's Efforts to Contract with the U.S. State Department and Misuse of State Department Information**

55.    Since 2014, MobiChord has been a platform partner with Service Now, a top-tier provider of government information technology ("IT") contracts.

56.    Service Now contracts with numerous government agencies to provide a variety of IT-related services and partners with companies like MobiChord to manage those contracts.

57.    With annual revenues of approximately $1.4 billion, Service Now is one of the largest and most-trusted suppliers of IT-related services to the federal government.

58.    In government procurement, partnerships with established vendors like Service Now are especially valuable because such partnerships allow new vendors to fast-track their applications to provide services to the government.

59.    Often, once a vendor has successfully finalized one contract with a bureau or agency of the federal government, that vendor will be preferentially placed to enter into additional contracts with other divisions.

60.    In or around August 2016, MobiChord began negotiating with the State Department to provide its data analysis tools to optimize the State Department's mobile device usage.

61.    Cella was in charge of the negotiations and worked closely with State Department officials.

62.    On information and belief, the proposed contract (the "Contract") was worth approximately $3.9 million over three years.

63.    The Contract was MobiChord's largest single contract to date and would have constituted approximately thirty-five percent (35%) of the company's annual revenue.

10

64.     Although the Contract originally contemplated that MobiChord would simply license its technology to the State Department, on information and belief, MobiChord ultimately negotiated to provide a managed service under which MobiChord would actively monitor and analyze the State Department's data.

65.     Under the Contract, MobiChord will be granted access to all State Department mobile device data, including call logs, text messages, instant messenger logs, GPS and other location-based data, email and other messaging services, and all web browsing history of all State Department employees.

66.     Such employees included diplomats and their staff living abroad, as well as employees located in the United States.

67.     On information and belief, much of the data to which MobiChord will be privy constitutes classified material.

68.     For example, on information and belief, MobiChord will be privy to the location of every State Department mobile device—including those devices used by senior State Department officials and diplomats—at all times.

69.     As another example, on information and belief, MobiChord will have complete access to both the content and the metadata associated with emails, text messages, and chat programs used by all State Department employees in their official business.

70.     In or around July and August 2016, the State Department provided MobiChord with an anonymized data set on which MobiChord could run its analytics so that MobiChord could demonstrate the potential cost savings of its system.

71.     Although this data set was anonymized, the State Department directed that the data was not to leave the State Department's facility under any circumstances.

11

72.     Unbeknownst to the State Department and Cella, Klimenko set up a "mirror" in which the State Department's data set was copied and transmitted to analysts in Kiev, Ukraine.

73.     On information and belief, Uhl knew of and approved the use of this mirror.

74.     On information and belief, Klimenko and Uhl set up this mirror so that MobiChord could make use of lower-paid, non-U.S. citizen analysts in the Ukraine.

75.     The Ukrainian analysts were granted full access to the State Department's data, which even in an anonymized form the State Department wanted kept solely within its facility.

76.     Access to such data by unauthorized individuals constitutes a grave threat to U.S. national security.

77.     In a highly unusual move, Uhl and Klimenko cut Cella out of the information loop regarding the analysis of the State Department's data set.

78.     Usually, the sales representative in charge of a contract is informed of the outcome of MobiChord's evaluation so that the sales representative can communicate that outcome to the client.

79.     On information and belief, Uhl and Klimenko deliberately chose not to inform Cella of the analyses conducted on the State Department's data set in order to prevent Cella from discovering that the data had been sent overseas.

80.     When Cella became aware of the use of the mirror for the State Department's data, he protested to Uhl.

81.     Uhl's response was that use of the mirror was not a problem because the servers on which the State Department's data was ultimately stored were in the United States.

82.    Of course, the fact that the data set was stored on servers in the United States does not mitigate the fact that non-U.S. citizens in the Ukraine were granted access to and performed detailed analyses on that data.

83.    The transmission of the State Department's data to analysts in the Ukraine was consistent with MobiChord's usual practice.

84.    On information and belief, MobiChord has followed the same practice with other clients, including the Royal Bank of Canada and Williams Electric, another government contractor.

85.    On information and belief, the transmission of those clients' data to overseas analysts was in violation of the law and of MobiChord's contractual obligations.

86.    When Cella became aware that MobiChord had sent data from the Royal Bank of Canada and Williams Electric overseas, he expressed his concerns to Uhl about data being sent outside the clients' networks.

87.    As part of the negotiation process for the Contract, the State Department expressly asked MobiChord about whether it was under FOCI.

88.    In or about August 2016, Cella brought forth concerns about disclosing MobiChord's foreign ownership and control.

89.    Indeed, as described in paragraphs 20 through 27, above, *none* of MobiChord's management or board of directors is a U.S. citizen.

90.    Uhl rejected Cella's concerns and suggested that such disclosures were not Cella's responsibility.

91.    Throughout the fall of 2016, Cella repeatedly raised his concerns about MobiChord needing to disclose its foreign ownership with the State Department and was repeatedly told that he was not to make such disclosures.

92.    On information and belief, MobiChord never made the required disclosures.

93.    On information and belief, MobiChord leveraged its relationship with Service Now—a trusted government contractor—to avoid State Department scrutiny of MobiChord's ownership.

**Termination of Cella's Employment with MobiChord**

94.    Despite Cella's exemplary performance as VP of Sales, Uhl suddenly terminated Cella's employment with MobiChord on December 31, 2016—one month before the first quarter of Cella's options was to vest.

95.    Cella's termination was highly irregular in that there were no indications Uhl or anyone else was unhappy with Cella's performance.

96.    Nor was Cella provided with any termination paperwork, as is usually provided.

97.    Instead, Uhl approached Cella without warning, asked him to complete paperwork needed to finalize several sales contracts Cella had negotiated, then asked Cella to follow him to his office, handed Cella a check for the commissions owed on recently closed contracts, and informed Cella he was fired.

98.    MobiChord did not pay Cella commissions on the contracts he originated, but which had not officially closed, despite the fact that Cella had completed all of the steps necessary to bring in the contracts.

99.    For example, on the day he was terminated, Cella finalized contracts worth more than $300,000 with new clients.

14

100.    Those contracts should have resulted in second and third year commissions of more than $17,500 for Cella, but no such commissions were ever paid.

101.    Because Uhl terminated Cella's employment prior to February 1, 2017, Cella was denied the first quarter of his option, as well.

102.    On information and belief, Cella's termination was unrelated to any legitimate business concern.

103.    Rather, on information and belief, Cella's termination was motivated by concerns he raised related to MobiChord's mishandling of the State Department's data and failure to disclose its foreign ownership, as required by law, and by Mobichord's desire to terminate Cella before his interest in Mobichord began to vest.

104.    In fact, *none* of U.S.-citizen MobiChord employees who had knowledge of the Contract remain with MobiChord today; all such employees have been fired.

## FIRST CLAIM FOR RELIEF
### (Violations of the FCA – 31 U.S.C. § 3729 – All Defendants)

105.    Relator hereby incorporates paragraphs 1 through 104 of this Complaint by reference, as if fully set forth herein.

106.    Defendants pursued and, on information and belief, entered into a contract to provide telecom management services to the State Department, which granted Defendants access to classified and confidential information.

107.    On information and belief, Defendants continue to pursue contracts to provide similar services to other government entities and contractors.

108.    Because MobiChord is owned and controlled by foreign interests, it is required to disclose and, if possible, mitigate the effects of those interests as a precondition to entering into the Contract.

109.    MobiChord was required to maintain the confidentiality and security of the State Department's data, but instead unlawfully transmitted that data to non-U.S. citizens in the Ukraine.

110.    When the State Department expressly inquired into MobiChord's foreign ownership, on information and belief, MobiChord falsely certified that it was not under FOCI.

111.    But for MobiChord's false certifications or, in the alternative, its material omissions, the State Department would not have entered into the Contract because such Contract is illegal.

112.    The United States has been injured in an amount to be determined at trial of no less than $3.9 million.

113.    Defendants conduct described in this Complaint was knowing, as that term is used in the FCA.

### SECOND CLAIM FOR RELIEF
**(Whistleblower Retaliation – 31 U.S.C. § 3730 – All Defendants)**

114.    Cella hereby incorporates paragraphs 1 through 103 of this Complaint by reference, as if fully set forth herein.

115.    Cella was at all relevant times an employee of MobiChord.

116.    Under federal law, MobiChord was required to certify that it was in compliance with all applicable regulations, including NISPOM requirements.

117.    MobiChord did so certify or, in the alternative, MobiChord's continued participation in the Contract constitutes an implied certification of its compliance with the required regulations.

118.    This certification was false and/or fraudulent because, as described in paragraphs 20 through 27 above, MobiChord is owned and/or controlled by non-U.S. citizens and because, as described in paragraphs 70 through 75, MobiChord improperly and illegally transmitted the State Department's data overseas to unapproved, non-U.S. citizens.

119.    Cella informed Uhl in Uhl's capacity as MobiChord's CEO that MobiChord was required to disclose its foreign ownership and that much of MobiChord's analysis was conducted in the Ukraine.

120.    Instead of making such disclosures, Uhl directed Cella not to tell anyone.

121.    Shortly thereafter, Uhl, in his capacity as MobiChord's CEO and individually, terminated Cella's employment at MobiChord.

122.    Cella is entitled to reinstatement of his job and to damages to be determined at trial of no less than two times back pay with interest and special damages, including litigation costs and attorney fees incurred herein.

### THIRD CLAIM FOR RELIEF
### (Retaliation under Utah Whistleblower Act – Utah Code § 67-21-3 – All Defendants)

123.    Cella hereby incorporates paragraphs 1 through 103 of this Complaint by reference, as if fully set forth herein.

124.    Cella was at all relevant times an employee of MobiChord.

125.    In good faith, Cella notified Uhl, MobiChord's CEO, that MobiChord was not in compliance with all applicable regulations, as described in paragraphs 88 through 92, above.

126.    Shortly thereafter, Uhl, in his capacity as CEO and individually, terminated Cella's employment.

127.    Cella is entitled to reinstatement and to damages in an amount to be determined at trial of no less than Cella's back pay and special damages, including litigation costs and reasonable attorney fees incurred herein.

## FOURTH CLAIM FOR RELIEF
### (Breach of Contract – MobiChord)

128.    Cella hereby incorporates paragraphs 1 through 103 of this Complaint by reference, as if fully set forth herein.

129.    Cella had a valid and enforceable employment contract with MobiChord.

130.    Cella performed all of his obligations under such contract.

131.    MobiChord breached the contract by, among other things, terminating Cella's employment less than a month prior to the vesting of Cella's options and failing to pay commissions owed to him.

132.    Cella has been damaged in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF
### (Breach of the Covenant of Good Faith and Fair Dealing – MobiChord)

133.    Cella hereby incorporates paragraphs 1 through 103 of this Complaint by reference, as if fully set forth herein.

134.    Cella had a valid and enforceable employment contract with MobiChord.

135.    MobiChord had an obligation not to intentionally interfere with Cella's rights under that contract.

136.    MobiChord did intentionally interfere with Cella's reasonable expectations when it summarily terminated Cella's employment one month before Cella's first set of options was to vest.

137.    If further intentionally interfered with Cella's reasonable expectations when it summarily terminated Cella's employment after he originated, negotiated, and had done everything but close the largest contract in the company's history and a number of other contracts for MobiChord.

138.    Cella was damaged as a result of such interference in an amount to be determined at trial.

### SIXTH CLAIM FOR RELIEF
**(Wrongful Discharge in Violation of Public Policy – MobiChord and Uhl)**

139.    Cella hereby incorporates paragraphs 1 through 103 of this Complaint by reference, as if fully set forth herein.

140.    At all relevant times, Cella was an employee of MobiChord.

141.    Utah has a substantial and established public policy prohibiting retaliatory termination of employees who bring to light violations of law.

142.    On information and belief, Cella was terminated from his employment at MobiChord in violation of that public policy.

143.    MobiChord and Uhl's actions, as described above, were willful and malicious or, in the alternative, were taken with knowing and reckless disregard for Cella's rights.

144.    Cella is entitled to an award of compensatory and punitive damages in an amount to be determined at trial.

## SEVENTH CLAIM FOR RELIEF
### (Tortious Interference with Existing Contractual Relations - Uhl)

145.   Cella hereby incorporates paragraphs 1 through 103 of this Complaint by reference, as if fully set forth herein.

146.   Cella had a valid and enforceable contractual relationship with MobiChord.

147.   Uhl intentionally interfered with that contractual relationship by using his position as MobiChord's CEO to terminate Cella's employment.

148.   Such interference was wrongful in that it was in violation of state and federal whistleblower laws, as described above.

149.   On information and belief, Uhl's interference was motivated by a desire to avoid civil and/or criminal liability in his personal capacity for his misuse of the State Department's data and failure to disclose MobiChord's foreign ownership, as required by law.

150.   Uhl's actions, as described above, were willful and malicious or, in the alternative, were taken with knowing and reckless disregard for Cella's rights.

151.   Cella is entitled to an award of compensatory and punitive damages in an amount to be determined at trial which are believed to exceed $3 million.

## EIGHTH CLAIM FOR RELIEF
### (Fraudulent Inducement – Uhl and MobiChord)

152.   Cella hereby incorporates paragraphs 1 through 103 of this Complaint by reference, as if fully set forth herein.

153.   While recruiting Cella to work at MobiChord, Uhl—in his capacity as MobiChord's CEO—represented that Cella would be compensated, in part, through the Option Program.

154.     Uhl further represented that Cella would be justified in leaving his prior employment with a substantially larger base salary because he would make more through the ongoing commissions he would receive from the sales contracts he and his team negotiated and that Cella would have ultimate independence in his ability to negotiate the sales contracts.

155.     On information and belief, those representations were false when made because Uhl and/or MobiChord never had any intention of allowing Cella's options to vest or to complete their promises to Cella about his ongoing commissions or authority to negotiation contracts on MobiChord's behalf.

156.     On information and belief, such representations were made with the intent to induce Cella to accept employment at MobiChord and to devote his efforts to expand MobiChord's business.

157.     Cella did, in fact, rely on that representation.

158.     Based on that fraudulent representation, Cella is entitled to an award of compensatory and punitive damages in an amount to be determined at trial.

## NINTH CLAIM FOR RELIEF
### (Unjust Enrichment – MobiChord)

159.     Cella hereby incorporates paragraphs 1 through 103 of this Complaint by reference, as if fully set forth herein.

160.     As described in paragraphs 97 through 100 above, prior to his termination from MobiChord, Cella completed all of the requirements to finalize a number of contracts with new clients, thereby conferring a substantial benefit on MobiChord.

161.     MobiChord knew that Cella had completed all necessary requirements to finalize those contracts and was therefore entitled to the commissions earned on those contracts.

162.    Nevertheless, MobiChord did not pay Cella his earned commissions and, instead, Uhl summarily terminated Cella's employment after Cella completed the paperwork.

163.    It would be unjust to allow MobiChord to retain the benefit of Cella's work—the newly formed contracts—without paying Cella his promised commissions.

164.    MobiChord's actions, as described above, were willful and malicious or, in the alternative, were taken with knowing and reckless disregard for Cella's rights.

165.    Cella is entitled to an award of compensatory and punitive damages in an amount to be determined at trial which are believed to exceed $3 million.

## TENTH CLAIM FOR RELIEF
### (Promissory Estoppel – MobiChord)

166.    Cella hereby incorporates paragraphs 1 through 103 of this Complaint by reference, as if fully set forth herein.

167.    Cella was promised that he would receive an ownership interest in MobiChord, be paid an ongoing commission for the sales contracts he procured, and have a great degree of independence in how he operated the sales team and procured sales contracts for MobiChord if he agreed to leave his prior employment and come to work for MobiChord.

168.    Cella reasonably relied on such promises when he did, in fact, leave his prior employment and took a position as MobiChord's VP of Sales for America.

169.    Such reliance has damaged Cella because he left his prior employment to dedicate his time and energy to promoting MobiChord's interests, but was summarily terminated shortly before his ownership interest would vest.

170.    MobiChord's actions, as described above, were willful and malicious or, in the alternative, were taken with knowing and reckless disregard for Cella's rights.

22

171.    Cella is entitled to an award of compensatory and punitive damages in an amount to be determined at trial which are believed to exceed $3 million.

WHEREFORE, Relator prays for judgment and relief against Defendants as follows:

A.    For judgment in favor of Relator and the United States of no less than $11.5 million, or three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of the FCA;

B.    For an award of 25% of the proceeds of this Action if the United States elects to intervene, and 30% if it does not;

C.    For an award of Relator's attorney fees, costs, and expenses incurred herein;

D.    For judgment in favor of Cella and against Defendants on each of Cella's claims;

E.    For an award of all available damages, including general and consequential damages;

F.    For an award of punitive damages as permitted by law;

G.    For an award of pre-judgment and post-judgment interest on all applicable amounts;

H.    For an award of costs and attorney fees as permitted by law; and

I.    For such other and further relief as the Court may deem proper and just.

## JURY TRIAL DEMANDED

Pursuant to Rule 38 of the *Federal Rules of Civil Procedure*, Relator hereby requests trial by jury of all claims and issues triable of right by a jury.

DATED: June 5, 2017.

PARR BROWN GEE & LOVELESS

Jonathan O. Hafen
Jenifer L. Tomchak
Cynthia D. Love

*Attorneys for Relator*