IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| TRAVIS CELLA, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>MOBICHORD, INC., a Delaware corporation; HERBERT UHL, an individual; and OLESKII KLYMENKO, an individual,<br><br>Defendants. | ORDER<br>AND<br>MEMORANDUM DECISION<br><br>Case No. 2:17-cv-527-TC |

Defendants move the court to dismiss the nine claims asserted by Plaintiff Travis Cella, the former Vice President of Sales for America at Defendant MobiChord, Inc. Mr. Cella, who contends he was wrongfully terminated from his job in December 2016, alleges whistleblower retaliation, breach of contract, fraud, and other tort- and equity-based claims of recovery. For the reasons set forth below, Defendants' Motion to Dismiss (ECF No. 16) is GRANTED IN PART AND DENIED IN PART.

# FACTUAL ALLEGATIONS[1]

## MobiChord

MobiChord, Inc., a "telecom service management company," (Second Am. Compl. ¶ 15 (hereinafter "Complaint" or "Compl."), ECF No. 15), was founded by Defendants Herbert Uhl and Oleskii Klymenko.  MobiChord offers subscription-based services to private businesses and government agencies through use of a "data aggregation tool" to analyze the client's mobile device usage and develop a plan for the client to "better manage its mobile device expenses." (Id.)  "For example, MobiChord collects detailed information about phone calls, text messaging, email usage, GPS and location-based data, and web browsing of each individual user within an organization and applies its data analysis tool to determine the most optimized mobile device plan for each user."  (Id. ¶ 16.)  Through this service, "MobiChord's clients are able to save thousands of dollars per month in unnecessary expenses and coverage charges."  (Id. ¶ 17.)

Mr. Uhl is MobiChord's Chief Executive Officer and a member of the company's board of directors.  Mr. Klymenko is the Chief Technology Officer (CTO) for MobiChord and is also a board member.

## Mr. Cella's Employment Contract and Compensation

Mr. Cella worked for many years for government contractors and, as a result, developed extensive expertise in the government contract procurement process.  In 2016, Mr. Uhl recruited Mr. Cella to work for MobiChord.  Mr. Uhl approached Mr. Cella and promised that if Mr. Cella left his job to work for MobiChord, he would be paid an ongoing commission for sales contracts

---

[1] The facts are taken from Mr. Cella's Second Amended Complaint (ECF No. 15) as well as the attached employment contract, and are treated as true for purposes of the court's analysis under Rule 12(b)(6).  See Toone v. Wells Fargo Bank, N.A., 716 F.3d 516, 521 (10th Cir. 2013) (taking all well-pleaded allegations as true with the caveat that a court is "permitted to review 'documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity.'") (quoting Gee v. Pacheco, 627 F.3d 1178, 1186 (10th Cir. 2010)).

he procured, would have a great deal of independence in how he operated the sales team and procured sales contracts for MobiChord.  Mr. Cella, relying on Mr. Uhl's representations, accepted the position with MobiChord on January 16, 2016, and signed an agreement (hereinafter "the Agreement," attached as Ex. A to the Complaint).

The Agreement guaranteed a base salary and commissions that ranged from three to seven percent on sales in America up to $2,000,000, and an additional two percent commission on sales in America above $2,000,000.  (See id. ¶¶ 29–31.)  The Agreement reads as follows:

> You will be paid a guaranteed base salary of $120,000 per year paid in twenty-four bi-weekly rates of $5,000, payable on the Company's regular payroll.
>
> Your commission is $120,000 per year, if you reach the yearly target.  Your on target earning (OTE) is $240,000 (base salary plus commission).  …
>
> The calculation of your commission in 2016 is based on the subscription invoices of MobiChord in America.  Your 2016 target for subscription invoice is $2,000,000 ($1,630,000 direct and 370,000 indirect).  For eligible invoices you will receive a commission of 7% of your direct new customer and 3% of your indirect (managed by your sales team or from existing customer).  For invoices after you reached your target of $2,000,000 you receive an additional commission of 2%.  The compensation will be paid in the month following the payment of the customer.

(Agreement at 1, ¶ 2.)

Mr. Cella also participated in MobiChord's stock option program ("Option Program"), which awarded him one percent of MobiChord's shares, vesting over four years.  (Compl. ¶¶ 32–33.)  Twenty-five percent of Mr. Cella's option was to vest on February 1, 2017, the first anniversary of his employment.  (See Agreement at 1, ¶ 2 ("25% of the option will vest after the first year").)  The remaining seventy-five percent was to vest at the rate of 1/48 of the option per month.  (Id.) Mr. Cella believes that his option was valued at more than $750,000.

The Agreement also stated that Mr. Cella's employment with MobiChord was "for no specific period of time" and that it was "at will," which means that "either [Mr. Cella] or the

Company may terminate [his] employment at any time and for any reason, with or without cause." (Id. at 2, para. 4.) The nature of the employment relationship could only be changed "in an express written agreement signed by [Mr. Cella] and the Company's CEO." (Id.)

During his time at MobiChord, Mr. Cella was very successful, bringing in the most contracts for large clients in the whole company. In October 2016, Mr. Cella received a performance bonus, which Mr. Uhl expressly stated was in recognition of Mr. Cella's exemplary work.

**MobiChord's Negotiation with the U.S. State Department for a Government Contract**

In August 2016, MobiChord began negotiating with the U.S. State Department to provide MobiChord's data analysis tools to help the State Department more efficiently manage its mobile device usage. Mr. Cella was in charge of the negotiations and worked closely with State Department officials. The proposed contract was, according to Mr. Cella, worth approximately $3.9 million over three years and would have been MobiChord's largest contract at that time, constituting approximately thirty-five percent of MobiChord's annual revenue.

If MobiChord obtained the contract, it would be granted access to all State Department mobile device data, including call logs, text messages, instant messenger logs, GPS and other location-based data, email and other messaging services, and the web browsing history of all State Department employees. Those employees include diplomats and their staff living abroad, as well as employees located in the United States. According to Mr. Cella's allegations, much of that data would be classified information.

A government contractor working with classified information must comply with the National Industrial Security Program (NISP). The NISP requires, among other things, that a government contractor must ensure that non-U.S. citizens are not employed in duties that require

access to classified material.  (Compl. ¶ 41.e (citing the National Industrial Security Program

Operating Manual (NISPOM) 2-209).)  The NISPOM also mandates that a contractor may not,

under any circumstances, allow a non-U.S. citizen employee located outside the United States to

have access to classified information.  (Id. ¶ 41.i (citing NISPOM 10-601(a)-(b)).)  And storage

of classified information by contractor employees at any location outside the United States is

strictly prohibited, unless the non-U.S. location is controlled by the U.S. government.  (Id. ¶ 41.j

(citing NISPOM 10-602(a)).)

        The program also requires the contractor handling classified material to obtain a facility

clearance. (Id. ¶ 41.a (citing NISPOM 2-100).)  No facility clearance will be granted if the

company is under foreign ownership, control or influence (FOCI) and security measures have not

been put in place to mitigate that FOCI.  (Id. ¶ 41.l. (citing NISPOM 2-102(d); 32 C.F.R.

§ 117.56); id. ¶ 41.n).)  A U.S. company is considered to be under FOCI

> whenever a foreign interest has the power, direct or indirect, whether or not
> exercised, and whether or not exercisable through ownership of the U.S.
> company's securities, by contractual arrangements or other means, to direct or
> decide matters affecting the management or operations of that company in a
> manner which may result in unauthorized access to classified information or may
> adversely affect the performance of classified contracts.

(Id. ¶ 41.m (quoting NISPOM 2-300(a); 32 C.F.R. § 117.56(b)(1)).)  According to Mr. Cella,

MobiChord is "under FOCI" because Mr. Uhl is a German national and Mr. Klymenko is a

Russian national.

        Moreover, a company applying for a facility clearance must complete a "Certificate

Pertaining to Foreign Interests."  (Id. ¶ 42.)  That requires disclosing to the U.S. Government

facts concerning foreign ownership or control of the company.  This information includes

situations where a foreign national holds a beneficial ownership in the company of more than

five percent and when a non-U.S. citizen serves on the company's board of directors or holds a senior management position with the company.

In July or August of 2016, the State Department wanted to test MobiChord's technology before granting the contract. To that end, it provided MobiChord with an "anonymized" set of data[2] on which MobiChord could run its analytics and demonstrate the potential cost savings of its system. Even though the data was anonymized, the State Department directed that the data was not to leave the State Department's facility under any circumstances. But Mr. Klymenko and Mr. Uhl, without telling Mr. Cella or the State Department, set up a "mirror" in which the State Department's data set was copied and transmitted to analysists in Kiev, Ukraine, with the apparent purpose of using lower-paid, non-U.S. citizen analysts in the Ukraine.

## Mr. Cella's Warnings About Violation of Government Contract Requirements

When Mr. Cella learned of use of the mirror, he protested to Mr. Uhl and expressed concern about Mr. Uhl's transmission of data outside the State Department's network and, more specifically, to a foreign country. He also told Mr. Uhl that MobiChord had to disclose its foreign ownership and control. But Mr. Uhl rejected Mr. Cella's concerns and suggested that such disclosures were not Mr. Cella's responsibility. Still, throughout the fall of 2016, Mr. Cella repeatedly raised his concerns about the lack of disclosure. His warnings went unheeded and, according to Mr. Cella, MobiChord never disclosed its foreign ownership.

## Termination of Mr. Cella's Employment

On December 31, 2016, Mr. Uhl suddenly terminated Mr. Cella's employment, one month before twenty-five percent of Mr. Cella's option was to vest. Mr. Cella had received no indication that Mr. Uhl or anyone else was unhappy with his performance. He did not receive

---

[2] An anonymized data set has been stripped of identifying information so that the original source of the data cannot be known. See Merriam-Webster Dictionary.

the usual termination documents. Instead, Mr. Uhl approached Mr. Cella without warning, asked him to complete paperwork needed to finalize several sales contracts Mr. Cella had negotiated, gave Mr. Cella a check for commissions owed on recently closed contracts, and fired Mr. Cella.

MobiChord did not pay Mr. Cella commissions on the contracts he originated, but which had not officially closed, despite the fact that Mr. Cella had completed all of the steps necessary to bring in the contracts. Given the number of contracts that were substantially complete as a direct result of Mr. Cella's efforts, Mr. Cella would have been entitled to commissions exceeding $1 million. Also, because Mr. Uhl terminated Mr. Cella's employment before February 1, 2017, Mr. Cella was denied the first quarter of his option as well.

According to Mr. Cella, his termination was not related to any legitimate business concern. Rather, his termination was motivated by (1) Mr. Cella's continued complaints related to MobiChord's mishandling of the State Department's data and failure to disclose its foreign ownership, (2) MobiChord's desire to terminate Mr. Cella before his interest in MobiChord began to vest, and (3) MobiChord's desire to benefit from the large number of contracts Mr. Cella brought in without paying Mr. Cella the commissions owed to him.

**ANALYSIS**

Mr. Cella has asserted nine claims in his Second Amended Complaint. Two are brought under whistleblower statutes. Two arise out of the employment contract he had with MobiChord. One asserts wrongful discharge in violation of public policy. And the remaining four assert tort-based claims, including fraud. The Defendants have moved to dismiss all nine.

**WHISTLEBLOWER RETALIATION**

Mr. Cella alleges that all three Defendants violated the federal False Claims Act and the Utah Whistleblower Statute, both of which protect whistleblowers from retaliation for disclosure

of certain types of wrongdoing.

### Federal Whistleblower Protection

Under the False Claims Act (FCA), 31 U.S.C. §§ 3729–3733,[3] a party states a claim for retaliation under the FCA when that party, as an employee of the defendant, "is discharged … because of lawful acts done by the employee … in furtherance of an action under this section or other efforts to stop 1 or more violations of [§ 3729, which prohibits false claims against the U.S. Government]." 31 U.S.C. § 3730(h). A person violates § 3729 if he "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A).

### FCA Claim Against Mr. Klymenko and Mr. Uhl as Individuals

Mr. Uhl and Mr. Klymenko assert that they cannot be liable under the FCA retaliation provision because that provision only reaches actions of employers, not supervisors such as themselves. The Tenth Circuit has not addressed this issue. The parties cite to opposing cases that support both propositions.

Part of the discussion in those cases focuses on the 2009 amendment of the FCA that removed the word "employer" from section § 3730(h). Some courts say that Congress' removal of that term necessarily means the statute is no longer limited to liability of an employer. But it appears that the majority of courts have reached the opposite, and more persuasive, conclusion. Those cases offer a logical reading of the statute based on the amendment's legislative history.

Those decisions interpret the amendment of Section 3730(h) as a move to expand the statute's protection not only of whistleblowing employees but also whistleblowing contractors

---

[3] A person can bring an action under the FCA as a "qui tam relator" on behalf of the United States if he has evidence that the defendant defrauded the federal government by submitting false claims for payment. 31 U.S.C. § 3730(b). Mr. Cella originally filed his action on behalf of himself as well as the United States. The Government has since reviewed the case and declined to join in the matter. (See U.S. Notice of Election to Decline Intervention (sealed), ECF No. 6.) Accordingly, only Mr. Cella's whistleblower claim remains.

and agents. "[V]iewing the changes to § 3730(h) as a whole, it is clear that the reference to an

'employer' was deleted to account for the broadening of the class of FCA plaintiffs to include

'contractors' and 'agents,' not to provide liability for individual, non-employer defendants."

Howell v. Town of Ball, 827 F.3d 515, 530 (5th Cir. 2016), cert. denied sub nom. Town of Ball,

La. v. Howell, 137 S. Ct. 815, 196 L. Ed. 2d 600 (2017).

The case of Simmons v. Boys & Girls Club of the Pike Peak Region, Case No. 16-cv-

01461-RBJ, 2017 WL 4337931 (D. Colo. Sept. 29, 2017) (unpublished), is illustrative. There

the district court rejected the argument Mr. Cella makes now and listed cases that have adopted

what appears to be the majority opinion.

> [P]laintiff contends that the amendments' omission of the phrase "by his or her
> employer" limiting the list of retaliatory actions expands the scope of defendants
> that may be held liable. This argument has been rejected so many times in recent
> years that it warrants little discussion here. "[T]he overwhelming majority of
> courts, including the Fifth Circuit, have held that the current version of § 3730(h)
> does not create a cause of action against supervisors sued in their individual
> capacities." Brach v. Conflict Kinetics Corp., 221 F. Supp. 3d 743, 748 (E.D. Va.
> 2016); accord Roberto v. Kent State Univ., No. 5:16CV1305, 2017 WL 1155563,
> at *2 (N.D. Ohio Mar. 28, 2017) (collecting twenty-five cases).

2017 WL 4337931 at *2. See also Aryai v. Forfeiture Support Assocs., 25 F. Supp. 3d 376, 387

(S.D.N.Y. 2012) (citing United States ex rel. Yesudian v. Howard Univ., 270 F.3d 969, 972

(D.C. Cir. 2001)) (Courts have "cited this mandatory language in rejecting individual liability . . .

on the common sense ground that 'remedies such as reinstatement' are remedies '[that] a mere

supervisor could not possibly grant in his individual capacity.'")

The court adopts the rule articulated in Howell and Simmons and the many cases they

cite. Accordingly, Mr. Cella's FCA claim against Mr. Uhl and Mr. Klymenko is dismissed.

The court also notes that Mr. Cella's FCA claim against Mr. Klymenko is deficient

because he does not allege that Mr. Klymenko had knowledge of Mr. Cella's concerns or

complaints. He only alleges that Mr. Cella addressed his concerns with Mr. Uhl. Moreover,

none of the allegations suggest that Mr. Klymenko had any involvement with the decision to terminate Mr. Cella's employment.  Instead, Mr. Cella alleges that Mr. Uhl was responsible for discharging Mr. Cella.  Because Mr. Cella does not present relevant allegations against Mr. Klymenko, his federal whistleblower claim against Mr. Klymenko is dismissed on that ground as well.

<b>FCA Claim Against MobiChord</b>

To state a claim of retaliation under the FCA, a plaintiff must allege that "(1) she engaged in protected activity, (2) the defendant 'had been put on notice' of that protected activity, and (3) the defendant retaliated against the plaintiff 'because of' that activity."  <u>United States ex rel. Reed v. KeyPoint Gov't Solutions</u>, 923 F.3d 729, 738 (10th Cir. 2019).

  a. <u>Protected Activity</u>

Defendants contend that Mr. Cella did not engage in protected activity because his concerns did not involve a claim to the federal government for money or property.  "Cella fails to allege that MobiChord ever completed negotiations with the DOS and obtained a contract, or that MobiChord ever submitted a claim for payment to the DOS pursuant to such an agreement." (Mot. Dismiss at 8.)

Protected activity includes "steps 'in furtherance of' either a qui tam claim or <u>'other efforts to stop 1 or more violations' of the Act</u>."  <u>Reed</u>, 923 F.3d at 738 (emphasis added).  A violation of the Act occurs when a person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the federal government.  31 U.S.C. § 3729(a)(1)(A).  The FCA defines "claim" as "any request or demand, <u>whether under a contract or otherwise</u>, for money or property and whether or not the United States has title to the money or property[.]" 31 U.S.C. § 3729(2) (emphasis added).

According to MobiChord, Mr. Cella's allegations of regulatory violations—failure to comply with the reporting obligations necessary to gain access to classified information (e.g., the NISP and FOCI Certificate)—are unrelated to a claim submitted to the federal government or payment by the Government. "Cella fails to allege the existence of a contract under which MobiChord would even make such a request for payment or property, or make any 'specific representations about the goods or services provided.'" (Reply Supp. Mot. Dismiss (ECF No. 25) at 5 (quoting Universal Health Servs., Inc. v. United States, 136 S. Ct. 1989, 2001 (2016)).)

In response, Mr. Cella argues that fraud perpetrated on the federal government falls within the FCA even when it does not directly and expressly relate to payments.[4] The FCA includes "efforts to stop 1 or more violations' of the Act." 31 U.S.C. § 3730(h). Under that language, there need not be an actual exchange of money or property. See also U.S. ex rel. Bahrani v. Conagra, 465 F.3d 1189, 1194 (10th Cir. 2006) (noting that the United States Supreme Court has given the FCA "an expansive reading, observing that it covers all fraudulent attempts to cause the government to pay out sums of money") (internal citation omitted and quotation marks omitted).

Mr. Cella alleges that the falsification (or misleading omission) of information about MobiChord's control by non-U.S. citizens was a material step toward obtaining a contract with the DOS. Without the dataset, MobiChord would not be able to compete for the contract. And a

---

[4] Alternatively, Mr. Cella alleges that an actual claim was submitted to the government:

> [T]he Complaint alleges that information that belong to the federal government was actually shared as a result of Defendants' fraud. Under the relevant statutes, a "claim" is any request "for money or property." 31 U.S.C. § 1329(b)(2). [*sic*] In this case, the government's property—the U.S. State Department's dataset—was in fact conveyed to Defendants, based on their fraudulent representations or omissions, and then illegally provided to individuals in the Ukraine.

(Opp'n to Mot. Dismiss (ECF No. 19) at 10.) Mr. Cella's characterization of the dataset as property is not persuasive. The State Department temporarily released the information to allow MobiChord to demonstrate the potential cost savings to the federal government and convince the State Department to award the contract to MobiChord. Transfer of the dataset to MobiChord was not an exchange of property that resulted in an economic loss to the government.

successful demonstration of its analysis of the dataset could result in payments for MobiChord's services. See 31 U.S.C. § 3729(b)(4) (a false statement is material if it has "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property"); U.S. ex rel. Conner v. Salina Reg'l Health Ctr., Inc., 543 F.3d 1211, 1219 (10th Cir. 2008) (FCA covers false statements (or omissions) that are "material to the government's decision to pay out moneys to the claimant"). Taking Mr. Cella's allegations as true, he has alleged that he engaged in an effort to stop the fraudulent omission of information that would lead to the contract, which would result in presentation of a claim to the federal government.

   b. Notice

To plead notice, Mr. Cella must allege that MobiChord was aware that he had tried to stop MobiChord's alleged FCA violations. Reed, 923 F.3d at 766. In communications with his employer, he must convey a connection to the FCA. Id. at 767. A "plaintiff's actions need not 'lead to a viable *qui tam* action, but 'they must still have a nexus to an FCA violation." Id. (quoting U.S. ex rel. Grant v. United Airlines, Inc., 912 F.3d 190, 202 (4th Cir. 2018)). Notice can include "informing the employer of 'illegal activities' that would constitute fraud on the United States, warning the employer of regulatory noncompliance and false reporting of information to a government agency, or by explicitly informing the employer of an FCA violation." McBride v. Peak Wellness Center, Inc., 688 F.3d 698, 704 (10th Cir. 2012) (internal citations omitted).

MobiChord argues that Mr. Cella did not provide the required notice because his actions were consistent with his employment obligations. "When a plaintiff's normal job responsibilities include activity which may be protected, they must allege facts which 'overcome the presumption that they are merely acting in accordance with their employment obligations to put

their employers on notice.'" (Mot. Dismiss at 11 (quoting U.S. ex rel. Williams v. Martin-Baker Aircraft Co., 389 F.3d 1251, 1261 (D.C. Cir. 2004).)   MobiChord is referring to the rule that a "compliance employee" has a higher burden to allege notice.

An employee who is hired to track compliance with regulatory requirements must overcome a presumption that his actions were taken in accordance with his employment obligations.  See Reed, 923 F.3d at 767 ("compliance employees typically must do more than other employees to show that their employer knew of the protected activity").  An employee "whose job entails the investigation of fraud …. must make clear" that he engaged in protected activity "to overcome the presumption that [he] was merely acting in accordance with [his] employment obligations."  U.S. ex rel. Ramseyer v. Century Healthcare Corp., 90 F.3d 1514, 1523, n.7 (10th Cir. 1996),[5] quoted in Reed, 923 F.3d at 767.   In other words, a compliance employee must plead that he was "not just doing [his] job."  Reed, 923 F.3d at 767.

Mr. Cella was hired as a government-procurement expert who was expected to expand MobiChord's "footprint with federal and state governments."  (Mot. Dismiss at 11.)  He was in charge of negotiations with the State Department.  According to MobiChord, "when Cella advised Uhl about the use of the mirror for the State Department's data, it was merely in accordance with his expertise in government procurement and his employment duties to assist with negotiations."  (Id.)

The court disagrees.  Reviewing the allegations, the court concludes that Mr. Cella was not a "compliance employee."  He was a sales representative in charge of procuring contracts with the federal government.  He communicated his concerns when, as part of his job to procure the contract, MobiChord omitted a material piece of information that was required by, and

---

[5] The 2009 amendments to the FCA abrogated portions of Ramseyer.  But the Tenth Circuit in Reed said the Ramseyer court's reasoning concerning the compliance-employee presumption "survived the 2009 amendment."  Reed, 923 F.3d at 767.

material to, the government.

Mr. Cella has sufficiently alleged notice. He told MobiChord it "would need to alter a contract in order to avoid violating federal regulations." (Compl. ¶ 1.) Mr. Cella "protested to Uhl" about MobiChord's use of the mirror drive to send classified information to the Ukraine in violation of its promises to the State Department, "expressed his concerns to Uhl about data being sent outside the clients'[6] networks," "brought forth concerns about disclosing MobiChord's foreign ownership and control," and "repeatedly raised his concerns about MobiChord needing to disclose its foreign ownership with the State Department and was repeatedly told that he was not to make such disclosures" to the government. (Id. ¶¶ 74, 80, 82, 84–85, 103, 109.) Mr. Uhl "rejected Cella's concerns and suggested that such disclosures were not Cella's responsibility." (Id. ¶ 84.) Mr. Cella also alleges that "[d]espite knowing that MobiChord was ineligible to enter into government contracts under which it would acquire and handle classified information, on information and belief, Defendants nevertheless pushed forward with negotiating a contract with the United States Department of State … that would necessarily require MobiChord to handle such information." (Id. ¶ 2; see also id. ¶ 87 ("MobiChord leveraged its relationship with Service Now—a trusted government contractor—to avoid State Department scrutiny of MobiChord's ownership.").) When Mr. Cella told Mr. Uhl "that MobiChord was required to disclose its foreign ownership and that much of MobiChord's analysis as conducted in the Ukraine," Mr. Uhl "directed Cella not to tell anyone." (Id. ¶¶ 103–04.) Finally, Mr. Cella alleges that Mr. Uhl knew his actions were illegal and his decision to fire Mr. Cella "was motivated by a desire to avoid civil and/or criminal liability in his personal capacity for the misuse of the State Department's data and failure to disclose MobiChord's

---

[6] "Clients" refers not only to the State Department but also the Royal Bank of Canada and Williams Electric. (See Compl. ¶¶ 78, 80.)

foreign ownership, as required by law." (Id. ¶ 133.)

In short, the court denies MobiChord's request to dismiss Mr. Cella's FCA retaliation claim because Mr. Cella has adequately alleged the necessary elements, including "protected activity."

### State Whistleblower Protection

The Utah Whistleblower Act is found in the Utah Code under Chapter 21, titled "Utah Protection of Public Employees Act." It prohibits an employer from taking

> adverse action against an employee because the employee, or a person authorized to act on behalf of the employee, communicates in good faith … a violation or suspected violation of a law, rule, or regulation adopted under the law of this state, a political subdivision of this state, or any recognized entity of the United States.

Utah Code Ann. § 67-21-3. The statute defines "employer" as "the public body or public entity that employs the employee." Utah Code Ann. § 67-21-2(6)(a) (emphasis added). The language of the Utah Whistleblower Act, including its title focusing on public employees, shows an intent to protect public employees in the State of Utah. Utah courts have interpreted it that way as well. See McGraw v. Univ. of Utah, 449 P.3d 943, 946 (Utah Ct. App. 2019) (stating that the Utah Whistleblower Act "'prohibits public employers from taking adverse action against an employee") (emphasis added), quoting Thorpe v. Washington City, 243 P.3d 500, 503 (Utah Ct. App. 2010); Peterson v. Browning, 832 P.2d 1280, 1281 n.2 (Utah 1992) ("the statute does not specifically limit the rights of private employers").

Mr. Cella was an employee of MobiChord, a private company. Because the Utah statute only targets public employers, it does not apply here. Similarly, the Act does not reach the actions of Mr. Uhl or Mr. Klymenko. Although the Act does apply to actions by an agent of an employer (which the court assumes without deciding could include individuals), the agents would have to be acting on behalf of a public body or public entity. Mr. Uhl and Mr. Klymenko

were at most acting on behalf of MobiChord, a private entity. Accordingly, they are no more liable than MobiChord.

For these reasons, Mr. Cella's second cause of action is dismissed.

## BREACH OF CONTRACT AND COVENANT OF GOOD FAITH

Mr. Cella alleges that MobiChord violated the Agreement and the implied covenant that goes with it. First, he points to the fact that MobiChord terminated him less than a month before his first quarter option vested. Second, he says he earned, but was not paid, $1 million in commissions for contracts he originated and that were for all practical purposes complete (in other words, he had completed all steps necessary to finalize the deals).

MobiChord argues that the claims should be dismissed because his at-will employment status bars any claim of breach. Similarly, it contends that the recent Utah Supreme Court decision in <u>Vander Veur v. Groove Entertainment Technologies, Inc.</u>, 452 P.3d 1173 (Utah 2019) (<u>Vander Veur II</u>), disposes of his claim asserting a violation of the covenant of good faith and fair dealing inherent in the Agreement.

### Breach of Contract

There is no dispute that Mr. Cella's employment was "at will" and that his employment was "for no specific period of time." (Agreement at 2, ¶ 4.) The Agreement expressly states that Mr. Cella's at-will employment meant that either Mr. Cella or MobiChord could terminate his employment "at any time and for any reason, with or without cause." (<u>Id.</u>)

In an "at will" employment relationship, "there is no expectation between the parties that the employment will continue for a specified period of duration," and "both the employer and the employee have the right to terminate the employment for any reason (or no reason) except where prohibited by law." <u>Vander Veur v. Groove Entertainment Techs., Inc.</u>, 436 P.3d 109, 116 (Utah

Ct. App. 2018) ("Vander Veur I") (internal quotation marks and citations omitted), rev'd on other grounds by Vander Veur II.  For purposes of contract law, MobiChord had the right, which it exercised, to fire Mr. Cella at the time of its choosing whether it had a reason or not. [7]

But MobiChord's valid exercise of that right does not dispose of the question whether MobiChord breached the agreement by failing to pay Mr. Cella commissions he earned before termination.  "An at-will employment relationship does not mean that there is no contract between employer and employee."  Cook v. Zions First Nat'l Bank, 919 P.2d 56, 60 (Utah Ct. App. 1996).  In Cook, the court held that even though the at-will relationship between the employee and employer had ended, the employee could bring a breach of contract claim against the employer based on the agreement governing accrual of sick leave.  "That [the employee] was an at-will employee does not negate the existence of the sick leave contract between her and [her employer].  Consequently, whether [the employee] was an at-will employee is not dispositive, or even relevant, to [the employee's] claim for breach of her contract regarding sick leave."  Id. at 60.

Mr. Cella alleges that he earned the commissions for contracts that were substantially completed before his employment ended.  The Agreement sets the terms of compensation, which was based on salary and commissions.  But the calculation of commissions was described generally:

> Your commission is $120,000 per year, if you reach the yearly target.  Your on target earning (OTE) is $240,000 (base salary plus commission).  …

> The calculation of your commission in 2016 is based on the subscription invoices of MobiChord in America.  Your 2016 target for subscription invoice is

---

[7] In his opposition to the motion to dismiss, Mr. Cella asks, in the alternative, for permission to amend his complaint to support his breach of contract claim.  He says the amendment would allege that Mr. Uhl's statement to Mr. Cella about Mr. Cella's good performance, "together with other similar reassurances by Uhl about Cella's future with the company, modified the at-will employment relationship" between Mr. Cella and MobiChord.  (Opp'n at 14.)  The provision of the Agreement requiring modification in writing makes Mr. Cella's alternative theory futile.

> $2,000,000 ($1,630,000 direct and 370,000 indirect). For <u>eligible invoices</u> you
> will receive a commission of 7% of your direct new customer and 3% of your
> indirect (managed by your sales team or from existing customer). For <u>invoices</u>
> after you reached your target of $2,000,000 you receive an additional commission
> of 2%. <u>The compensation will be paid in the month following the payment of the
> customer.</u>

(Agreement at 1, ¶ 2 (emphasis added).) Neither the Complaint nor the Agreement describes the

requirements that had to be met before Mr. Cella was entitled to a commission. They do not

define "invoice," "subscription invoice," or "eligible invoice." Although the Agreement does

specify that he would be paid after the customer paid, it does not clarify whether he had to be

employed at the time the customer paid in order to receive the money. At the motion to dismiss

stage, the court must take all well-pleaded facts as true and construe them in a light most

favorable to the plaintiff. <u>Sylvia v. Wisler</u>, 875 F.3d 1307, 1313 (10th Cir. 2017). Mr. Cella

contends that he was entitled to a commission when he completed all steps necessary to finalize

the contracts. Nothing in the Agreement contradicts his assertion or interpretation of the terms of

his compensation. At this point, the court finds that he has adequately alleged a breach of the

agreement concerning payment of commissions.

As for the stock options, Mr. Cella has not alleged that he earned income from the

options before MobiChord fired him. As Mr. Cella himself alleges, his options would not have

vested until February 1, 2016, a month after his employment was terminated. Without that

vesting, nothing was owed during the time he was employed. Accordingly, that income is not

the proper subject of the breach of contract claim.

For the foregoing reasons, MobiChord's motion to dismiss the claim for breach contract

for non-payment of commissions is DENIED.

### **Breach of the Covenant of Good Faith and Fair Dealing**

According to Mr. Cella, MobiChord breached the covenant of good faith and fair dealing

when it terminated him to avoid paying commissions on contracts he brought in for the company and to avoid the imminent obligation to pay his first option. He alleges that MobiChord intentionally interfered with his reasonable expectations "when it summarily terminated Cella's employment one month before Cella's first set of options was to vest" and "after he originated, negotiated, and had done everything but close the largest contract in the company's history and a number of other contracts of MobiChord." (Compl. ¶¶ 121–22.)

MobiChord challenges Mr. Cella's claim on the ground that he has not alleged that MobiChord's "purported bad faith and unfair dealing was the 'but for' cause of his injuries":

> While Cella alleges that his termination impacted his receipt of compensation, the driving motive behind his termination was related to his whistleblower claim. … Cella cannot have it both ways. He cannot say his termination was caused by MobiChord's intent to retaliate for his alleged whistleblowing activities and also 'but for' the purpose of depriving Cella of his commissions.

(Mot. Dismiss at 17.)

Mr. Cella responds that he may plead in the alternative without being subject to dismissal. The court agrees. See, e.g., Fed. R. Civ. P. 8(d) (allowing pleading in the alternative, even if the claims are inconsistent); United States v. Roe, 913 F.3d 1285, 1300 n.21 (allowing party to plead alternative and inconsistent claims and noting that "Fed. R. Civ. P. 8(d) specifically allows for the pleading of inconsistent claims and inconsistent facts") (citing Smith v. Cashland, Inc., 193 F.3d 1158, 1161 (10th Cir. 1999)). Mr. Cella's claim does not suffer from a failure to plead causation. Accordingly, that is not a basis to dismiss it.

Additionally, MobiChord points to the Supreme Court of Utah's decision Vander Veur II, which affirmed in part and reversed in part the Utah Court of Appeals decision in Vander Veur I. (See Defs.' Oct. 31, 2019 Notice of Supplemental Authority, ECF No. 42.) In Vander Veur II, the Utah Supreme Court addressed "whether the implied covenant of good faith and fair dealing

prohibits an employer from terminating an [at-will] employee for the purpose of avoiding payment of commissions." 452 P.3d at 1177.

At the time the parties briefed and argued the issue of whether Mr. Cella stated a claim for breach of the covenant, the Utah Court of Appeals' decision in <u>Vander Veur I</u> was on appeal to the Utah Supreme Court. Given the in-limbo status of the issues in <u>Vander Veur</u>, the parties did not address the substance of the rulings.

Now that the Utah Supreme Court affirmed in part and reversed in part the appellate court decision, this court has had a chance to review its findings and consider how the ruling affects Mr. Cella's claim. Given the Utah Supreme Court's analysis, the court is inclined to find, as discussed below, that the facts as pled do not state a cause of action for breach of the covenant of good faith and fair dealing. That said, because the parties did not have a chance to brief the issue, the court dismisses the breach of the implied covenant without prejudice. Mr. Cella may file a motion to amend his complaint and argue that the <u>Vander Veur</u> decision does not foreclose his claim. In the meantime, the court points out the basis for its initial finding.

<u>Vander Veur II</u> reiterated the principle that an at-will employment relationship may be terminated at any time for any (or no) reason. 452 P.3d at 1178 n.18. It found that the employer had no obligation to retain its at-will sales employee until the in-process contracts had been completed (and the commissions earned). Instead, the employer had the "express and virtually unlimited authority" to terminate the employee whenever it chose to do so. <u>Id.</u>

But the Utah Supreme Court did not rule out the possibility that the implied covenant of good faith and fair dealing could apply in an at-will relationship. Such a claim could arise when the at-will employee had a compensation agreement with his employer.

The implied covenant infers "as a term of every contract a duty to perform in the good faith manner that the parties surely would have agreed to if they had foreseen and addressed the circumstance giving rise to their dispute." Young Living Essential Oils, LC v. Marin, 266 P.3d 814, 816 (Utah 2011). "In other words, 'each party impliedly promises that he will not intentionally or purposely do anything which will destroy or injure the other party's right to receive the fruits of the contract.'" Vander Veur II, 452 P.3d at 1177 (quoting St. Benedict's Dev. Co. v. St. Benedict's Hosp., 811 P.2d 194, 199 (Utah 1991)).

The Utah Supreme Court evaluated the compensation agreement (which defined "commission"), and noted that "[u]nder the covenant of good faith and fair dealing, we look to the 'parties' course of dealings or conduct' to determine a party's legal duty. And we may only impose such duties when, based on that course of conduct, it is clear that they 'undoubtedly would have agreed to the [duty] if they had considered and addressed it.'" Id. at 1179 (quoting Young Living, 266 P.3d at 817). The court identified other limits on application of the covenant. Of particular relevance is the principle that the covenant "cannot be construed to change an indefinite-term, at-will employment contract into a contract that requires an employer to have good cause to justify a discharge." Id. at 1177–78. Also important is the rule that "[t]he covenant of good faith and fair dealing is also informed by 'the agreed common purpose and the justified expectations of the other party.'" Id. at 1179 (quoting St. Benedict's, 811 P.2d at 200).

Here, Mr. Cella would need to plead that either the course of conduct between Mr. Cella and his employer or a settled custom or usage of trade demonstrates that he would have received payment for the contracts as they existed at the time he was terminated. But his complaint does not refer to any such course of conduct between him and his employer, or any custom or usage of trade that would govern actions concerning his compensation agreement. Accordingly, the court

cannot hold, based on the existing allegations, that MobiChord would have agreed to pay compensation for substantially completed contracts that had not formally closed or for an option that had not yet vested.

This initial finding is subject to change if Mr. Cella, in a motion for leave to amend, convinces the court otherwise. In the meantime, his claim for breach of the covenant of good faith and fair dealing is dismissed without prejudice.

## TORT CLAIMS

### Wrongful Discharge in Violation of Public Policy

Mr. Cella brings this claim against both MobiChord and Mr. Uhl. He alleges that "Utah has a substantial and established public policy prohibiting retaliatory termination of employees who bring to light violations of the law," and that he "was terminated from his employment at MobiChord in violation of that public policy." (Compl. ¶¶ 125–26.)

To state a claim for wrongful discharge in violation of public policy, Mr. Cella must allege "(i) that his employer terminated him; (ii) that a clear and substantial public policy existed; (iii) that the employee's conduct brought the policy into play; and (iv) that the discharge and the conduct bringing the policy into play are causally connected." Ryan v. Dan's Food Stores, Inc., 972 P.2d 395, 404 (Utah 1998). To determine whether a public policy is clear and substantial, the court must evaluate "whether the policy in question is one of overarching importance to the public, as opposed to the parties only." Retherford v. AT&T Commc'ns of the Mountain States, Inc., 844 P.2d 949, 966 n. 9 (Utah 1992). "A policy that affects a duty that inures solely to the benefit of the employer and the employee is generally insufficient to give rise to a substantial and important public policy." Touchard v. La-Z-Boy Inc., 148 P.3d 945, 950 (Utah 2006). The court must evaluate "whether the public interest is so strong and the policy so

clear and weighty that we should place the policy beyond the reach of contract, thereby constituting a bar to discharge that parties cannot modify, even when freely willing and of equal bargaining power." Retherford, 844 P.2d at 966 n.9.

Defendants assert that Mr. Cella's claim is insufficient as a matter of law because his actions did not bring into play what Mr. Cella asserts is Utah's policy "prohibiting retaliatory termination of employees who bring to light violations of law." (Compl. ¶ 125.) First, they argue that because Mr. Cella's FCA claim fails, his common-law claim also fails. (Mot. Dismiss at 19.) Second, they contend there is no relevant policy because "Utah courts have declined to recognize a substantial and important public policy where an employee reports a legal violation to his employer, rather than to public authorities." (Id.)

Although the court has held that Mr. Cella's FCA claim may go forward, Mr. Cella's claim for wrongful discharge in violation of public policy fails because he has not alleged the existence of a clear and substantial public policy. Mr. Cella reported his concerns to his employer and was allegedly fired for doing so. That is not actionable here. See Pang v. Int'l Document Servs., 356 P.3d 1190, 1201–02 (Utah 2015) (holding that plaintiff did not state claim for wrongful discharge in violation of public policy because he did not allege that he reported his employer's illegal activity to anyone outside the company); Fox v. MCI Commc'ns Corp., 931 P.2d 857, 861 (Utah 1997) ("[I]f an employee reports a criminal violation to an employer, rather than to public authorities, and is fired for making such reports, that does not, in our view, contravene a clear and substantial public policy."). Accordingly, this claim is dismissed.

### Tortious Interference with Contractual Relations

Mr. Uhl is alleged to have wrongfully interfered with Mr. Cella's valid and enforceable contractual relationship with MobiChord. To state a claim for tortious interference with

contractual relations, Mr. Cella must allege that Mr. Uhl intentionally interfered with Mr. Cella's existing or potential economic relations by improper means, and, by so doing, injured Mr. Cella. Eldridge v. Johndrow, 345 P.3d 553, 565 (Utah 2015).

In his complaint, Mr. Cella alleges that Mr. Uhl interfered with his contract "by using his position as MobiChord's CEO to terminate Cella's employment." (Compl. ¶ 131.) According to Mr. Cella, Mr. Uhl's interference was wrongful because it violated state and federal whistleblower laws and "was motivated by a desire to avoid civil and/or criminal liability in his personal capacity for his misuse of the State Department's data and failure to disclose MobiChord's foreign ownership, as required by law." (Id. ¶¶ 132–33.)

Defendants urge dismissal of this claim for two reasons. First, they argue that Mr. Cella has not alleged improper means, because his whistleblower claims fail as a matter of law. Second, they contend that when Mr. Uhl terminated Mr. Cella, he was acting as an agent of MobiChord and so cannot be liable for interference with MobiChord's contract with Mr. Cella.[8]

Because Mr. Cella has alleged a claim for whistleblower retaliation under the FCA, he has pleaded improper means.

But Mr. Cella has not alleged a tortious interference claim against Mr. Uhl, who was acting, at least in part, as MobiChord's CEO when he terminated Mr. Cella's employment.

Defendants point to cases which hold that an employee is not liable unless he was acting completely outside the scope of his employment. "When the defendants are also employees, … the plaintiff must establish that the defendants were acting outside the scope of their employment *for purely personal reasons*." Giusti v. Sterling Wentworth Corp., 201 P.3d 966, 979 (Utah

---

[8] Defendants cite to Leigh Furniture & Carpet Co. v. Isom, 657 P.2d 293 (Utah 1982), in support of their argument. The Leigh Furniture court stated that "one party to a contract cannot be liable for the tort of interference with contract for inducing breach by himself or the other contracting party." Id. at 301. But Mr. Uhl was not the party to the contract. Accordingly, Leigh does not apply here.

2009) (emphasis in original). "Employees act for purely personal motives when their actions are *in no way connected with the employer's interests*." Id. (emphasis in original). When "high level executives with the responsibility for the operation of [the company]" have "mixed motives" for terminating the plaintiff's employment, they are not liable unless their actions are "in no way connected with their employer's interests." Id.

Here, Mr. Cella alleges that Mr. Uhl fired him for (1) retaliating against him for engaging in protected conduct under the FCA; (2) avoiding personal criminal and civil liability; and (3) avoiding paying compensation to Mr. Cella. These are not purely personal reasons. At least some of those reasons would benefit the company's bottom line by avoiding a substantial payment to Mr. Cella, protecting the company's opportunity to obtain a large government contract, and avoiding company liability under the FCA. So even though Mr. Cella alleges that Mr. Uhl fired him to avoid personal liability, he has not alleged that Mr. Uhl acted out of purely personal motives. For this reason, Mr. Cella's claim for tortious interference is dismissed.

### **Fraudulent Inducement**

Mr. Cella asserts that Mr. Uhl, in his capacity as MobiChord's CEO, intentionally misrepresented the compensation Mr. Cella would receive if he left his job to work for MobiChord. He takes the position that Mr. Uhl's "representations were false when made because Uhl and/or MobiChord never had any intention of allowing Cella's options to vest or to complete their promises to Cella about his ongoing commissions or authority to negotiate contracts on MobiChord's behalf." (Compl. ¶ 139.) He further alleges that the representations "were made with the intent to induce Cella to accept employment at MobiChord and to devote his efforts to expand MobiChord's business and then terminate him before following through on its representations." (Id. ¶ 140.) Having relied on those representations, Mr. Cella seeks

"compensatory and punitive damages." (Id. ¶¶ 141–42.)

Mr. Uhl and MobiChord ask the court to dismiss the fraudulent inducement claim because Utah's economic loss rule bars recovery.[9] In general, the economic loss rule is potentially relevant when a contract exists between the parties and the plaintiff also pleads tort-based claims. "'[W]hen a conflict arises between parties to a contract regarding the subject matter of that contract, the contractual relationship controls, and parties are not permitted to assert actions in tort.'" HealthBanc Int'l, LLC v. Synergy Worldwide, Inc., 435 P.3d 193, 196 (Utah 2018) (quoting Reighard v. Yates, 285 P.3d 1168, 1176 (Utah 2012)).

But the rule does not apply here because Mr. Cella's claim does not overlap his breach of contract claim. The claim he alleges arose before formation of the Agreement, and, logically, is independent of the obligations the parties accepted when they entered into the Agreement. Given the timing of events, the Defendants are not entitled to dismissal of the fraudulent inducement claim.

**Equitable Claims of Unjust Enrichment and Promissory Estoppel**

The Defendants urge the court to dismiss these claims because the existence of Mr. Cella's employment contract bars recovery under the equitable theories of unjust enrichment and promissory estoppel. See Ashby v. Ashby, 227 P.3d 246, 250 (Utah 2010) ("a prerequisite for recovery on an unjust enrichment claim is the absence of an enforceable contract governing the rights and obligations of the parties relating to the conduct at issue"); E&H Land, Ltd. v. Farmington City, 336 P.3d 1077, 1087 (Utah Ct. App. 2014) ("promissory estoppel is available only to a party who has no right to relief under an enforceable contract").

---

[9] In their Motion to Dismiss, Defendants also asserted that Mr. Cella's fraudulent inducement claim should be dismissed because the complaint did not satisfy the requirement that a fraud-based claim be pled with specificity. (See Mot. Dismiss at 21–22.) They have since withdrawn that argument. (See Reply Supp. Mot. to Dismiss at 13 (ECF No. 25).)

Mr. Cella pleads these causes of action in the alternative. He is allowed to do so and avoid dismissal at the pleading stage. See, e.g., Fed. R. Civ. P. 8(d) (allowing pleading in the alternative, even if the claims are inconsistent); Sylvia v. Wisler, 875 F.3d 1307, 1321 (10th Cir. 2017) ("there is nothing in the federal rules … that [prevents the plaintiff] from pleading in the alternative claims sounding in both tort and contract … 'regardless of consistency'") (citing Fed. R. Civ. P. 8(d)(3)). Defendants cite to a state case to support their position that when the court has determined that a valid contract governs the parties' relationship, such a holding precludes the equitable claim. (Mot. Dismiss at 23.) But the court is not being asked to make such a determination at this point, so dismissing Mr. Cella's equitable claims would be premature. The court denies the Defendants' motion to dismiss those claims.

## ORDER

For the foregoing reasons, the Defendants' Motion to Dismiss (ECF No. 16) is GRANTED IN PART AND DENIED IN PART as follows:

1. All claims against Defendant Oleskii Klymenko are DISMISSED.

2. Mr. Cella's claims for Retaliation under the Utah Whistleblower Act (Second Cause of Action), Wrongful Discharge in Violation of Public Policy (Fifth Cause of Action), and Tortious Interference with Economic Relations (Sixth Cause of Action) are DISMISSED WITH PREJUDICE.

3. Mr. Cella's claim for breach of the covenant of good faith and fair dealing (Fourth Cause of Action) is DISMISSED WITHOUT PREJUDICE. Mr. Cella may file a motion seeking leave to amend that claim no later than 30 days from the date of this order.

4. Mr. Cella's claim for retaliation under the False Claims Act (First Cause of Action), is DISMISSED AGAINST MR. UHL ONLY. That claim AGAINST MOBICHORD IS NOT DISMISSED.

5. The remainder of Mr. Cella's claims (the First, Third, Seventh, Eighth, and Ninth) are not dismissed.

DATED this 27th day of January, 2020.

BY THE COURT:

TENA CAMPBELL
U.S. District Court Judge